ROBERT GENETTI AND SHERRIE GENETTI, APPELLEES, CROSS-APPELLANTS, AND CROSS-APPELLEES, V. CATERPILLAR, INC., A DELAWARE CORPORATION, APPELLANT AND CROSS-APPELLEE, AND GENERAL MOTORS CORPORATION, A DELAWARE CORPORATION, APPELLEE, CROSS-APPELLANT, AND CROSS-APPELLEE.

621 N.W. 2d 529

Filed January 26, 2001. No. S-99-813.

Aaron A. Clark, of McGrath, North, Mullin & Kratz, P.C., and Mark L. Tripp, of Bradshaw, Fowler, Proctor & Fairgrave, P.C., for appellant Caterpillar.

Terry R. Wittler, of Cline, Williams, Wright, Johnson & Oldfather, for appellee General Motors.

Gregory C. Scaglione and Thomas F. Ackley, of Koley Jessen, P.C., for appellees Robert and Sherrie Genetti.

HENDRY, C.J., CONNOLLY, GERRARD, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

After the engine in their truck failed four times, Robert Genetti (Genetti) and Sherrie Genetti brought suit against Caterpillar, Inc., and General Motors Corporation for breach of express warranty under the Uniform Commercial Code (U.C.C.) and relief under the "Manufacturer's Warranty Duties" statutes (Warranty Act), also known as the "lemon laws," Neb. Rev. Stat. § 60-2701 et seq. (Reissue 1998). The engine was manufactured by Caterpillar, and the truck was manufactured by General Motors. A jury awarded damages against both parties for breach of express warranty and found that General Motors was also liable under the Warranty Act.

After the verdict, the district court initially ordered the Genettis to make an election of remedies, but later dismissed the Warranty Act claim, finding that a claim under the Warranty Act was in equity and determining that the Genettis had an adequate remedy at law under the U.C.C. The primary questions on appeal are (1) whether a specific defect must be proved under the U.C.C. and the Warranty Act; (2) whether an action under the Warranty Act is an action at law or in equity; and (3) whether an election of remedies must be made when an action is brought, stating theories of recovery both under the Warranty Act and for breach of express warranty under article 2 of the U.C.C.

## I. BACKGROUND

On February 26, 1996, the Genettis, who are in the business of delivering furniture nationwide, bought a new 1996 GMC truck and trailer from Omaha Truck Center, Inc. The truck was manufactured by General Motors and was equipped with a model 3116 diesel engine manufactured by Caterpillar. The model 3116 engine is generally described as a medium-duty engine. The purchase price for the truck was $97,043, and the Genettis took possession around March 8. The warranties issued by General Motors and Caterpillar stated that the truck was warranted for 3 years or 150,000 miles. From the time of purchase, it was serviced only through General Motors and Caterpillar dealerships.

Following a series of problems with the engine, the Genettis brought suit against both Caterpillar and General Motors seeking relief for breach of express warranty under the U.C.C. and relief under the Warranty Act. In their operative petition, the Genettis prayed for an order requiring Caterpillar and General Motors, jointly and severally, to replace the truck with a comparable vehicle with similar features or to accept the return of the truck from the Genettis and refund the full purchase price along with the sales tax and licensing and registration fees. The Genettis also sought general damages and an award of attorney fees and costs.

In their amended answers, Caterpillar and General Motors raised as affirmative defenses that (1) the Genettis' claim was barred by the express terms of the warranties; (2) the use and market value of the truck was not substantially impaired; and (3) the nonconformities alleged were the result of abuse, neglect, or unauthorized modifications or alteration of the truck by the Genettis.

Genetti testified that he had 18 years of experience in driving, operating, and maintaining diesel engines and that it was his custom to check daily for engine problems such as leaking fluids. Furthermore, the truck was serviced according to the schedule provided by General Motors.

### 1. FIRST ENGINE FAILURE

Genetti testified that one of his drivers called him on September 23, 1996, and reported that the truck had a sudden loss of power and that a white vapor had suddenly come out of the tailpipe. The driver had pulled to the side of the road immediately, and Genetti had instructed him to have the truck towed to the nearest General Motors dealership. The dealership where the truck was towed told Genetti that the problem was a complete engine failure due to bad pistons and valves and a cracked block. The record shows that the dealership found coolant leaking from the engine. The truck was repaired by disassembling the engine, replacing the block, and reassembling the engine with some new parts, some remanufactured parts, and some original parts.

## 2. SECOND ENGINE FAILURE

Genetti testified that the truck broke down again on October 30 or 31, 1996. The driver called Genetti and told him that, like the first breakdown, the truck had experienced a sudden loss of power. The driver pulled over immediately and made arrangements for the truck to be towed to the nearest Caterpillar dealer. The dealership informed Genetti that a valve and piston had failed in the engine and that the repair work would be covered by the warranty. According to Genetti, he discussed the possibility of receiving a new engine with Wayne Allen Mohr, the service manager at the facility where the truck was repaired. Genetti stated Mohr informed him that the chances of getting a new engine paid for under the warranty were slim to none and that he was never offered a new engine by Mohr at any time. Mohr, however, testified that he sought and received authority to put a new engine in the truck, and a repair record shows a notation on it to that effect. Mohr did not specifically state whether the new engine was authorized to be entirely paid for under the warranty. Mohr also testified that he felt it was an adequate and proper remedy to repair, instead of replace, the engine. The truck was repaired with a remanufactured cylinder head group and turbocharger, and the pistons and rings were replaced. The truck was out of service for approximately a week while being repaired.

## 3. THIRD ENGINE FAILURE

The third failure occurred on January 2, 1997, outside of Salt Lake City, Utah. Genetti testified that he was driving and that he was accompanied by John T. Seeley, an employee. Like the other breakdowns, the truck suddenly lost power and a white vapor came out of the exhaust. The truck was towed to a Caterpillar service center, and after a day or two, Genetti was told that there had been a complete engine failure. Genetti then called Caterpillar and informed them that he wanted a new engine. Caterpillar authorized the replacement of the engine under the warranty. There is conflicting evidence in the record regarding how many original parts from the truck were put back onto the new engine after it was installed. Ervin A. Stepanek, the expert witness for the Genettis, testified that the turbo and other items would not be replaced but would be taken off the old

engine and put back onto the new one. Gary G. Valbert, an expert for Caterpillar, testified that a new engine would include a turbo, but some General Motors components from the old engine would be put back onto the new one. The record does not specifically show which component parts were replaced and which were reused. During the time the engine was being replaced, Genetti was required to rent several trucks in order to complete his deliveries.

### 4. FOURTH ENGINE FAILURE

Seeley was driving the truck when the fourth failure occurred in March 1997. Seeley testified that he was driving over a mountain pass when he noticed that the truck lost power and that the temperature gauge was higher than normal. Seeley did not observe a sudden puff of smoke like he had noticed during the third breakdown, but he did observe some smoke. Seeley continued to drive the truck until the gauge indicated that the engine was warmer than it should be and then pulled over to the side of the road to allow it to cool down. After the truck had cooled down, Seeley checked the coolant level, found it to be about half full, and added more coolant. Seeley then waited for the truck to completely cool down before starting to drive again. After Seeley began to drive again, the truck continued to overheat. Seeley testified that he had to stop and allow the truck to cool down "quite a few" times.

Seeley testified that once the truck got over the mountain pass, it was still running a little warm, but was also running all right. Seeley finished his deliveries and started back to Nebraska. When Seeley attempted to return to Nebraska, the truck began overheating again. Seeley took the truck to a General Motors dealership in Commerce City, Colorado. On the way to the dealership, Seeley stopped to add coolant to the truck and allow it to cool down. During one stop, Seeley observed that the truck was leaking coolant. Seeley did not allow the truck to overheat to the point where the temperature gauge went into the "red zone" for more than a couple of seconds during any of the overheating incidents.

When Seeley arrived at the dealership, an employee of the dealership told Seeley to park the truck and leave it running.

After 20 to 45 minutes had passed, an employee told Seeley to turn the truck off because it would be a while before the dealership could look at it. Genetti was later informed that Caterpillar had determined that the truck had been allowed to overheat and that it was not going to honor the warranty. Genetti was also told that the repairs would cost approximately $12,000, but Genetti did not authorize the repairs because he could not afford to pay for them. The dealership, however, repaired the truck using remanufactured components and issued an invoice to the Genettis for the repairs on March 28, 1997.

On March 26, 1997, 2 days before the invoice for repairs was issued, the Genettis' attorney sent a letter to both General Motors and Caterpillar stating that the truck had experienced engine problems on four different occasions and that due to those problems, the truck had been out of service for a cumulative total of more than 40 days. The letter stated that the Genettis did not wish to retain the truck and demanded that the manufacturer either replace the truck with a comparable vehicle or refund the full purchase price, including taxes and fees paid. Both Caterpillar and General Motors stipulated that they received the letter on March 26. The Genettis were unable to continue to make payments on the truck. Through a deal with a finance company, however, the finance company paid for the repairs, the Genettis picked up the truck in Commerce City, and the truck was sold on the open market to Eldon W. Heiser.

### 5. TESTIMONY OF SUBSEQUENT PURCHASER

Before trial, Caterpillar and General Motors made motions in limine to exclude testimony from Heiser regarding further breakdowns of the truck while he owned it because the testimony was irrelevant. The Genettis argued that the testimony was relevant to show that the fourth repair to the truck had also failed. The court reserved ruling on the issue until trial. At trial, both parties renewed their objections, which were overruled. However, the court gave a limiting instruction to the jury, stating that the testimony was to be considered only as evidence against General Motors on the Warranty Act claim.

Heiser testified by video deposition that he had experienced mechanical problems with the truck after he had purchased it.

These problems included the truck's losing power and smoking excessively. Heiser testified that on another occasion, the engine locked up and water came out of the exhaust pipe. It was later determined that the engine block on the truck was cracked between the cylinders. As a result, Caterpillar and/or General Motors replaced the engine under the truck's warranty. Heiser testified that he was told before he purchased the truck that the engine had been replaced but that he was not given any other repair history.

## 6. Expert Testimony

Stepanek testified for the Genettis and gave opinions regarding the cause of the breakdowns. Stepanek testified that he had 25 to 30 years of experience as a mechanic working on heavy-duty trucks and that he had performed just about every type of repair that could be done to diesel engines. He further stated that he had worked with Caterpillar diesel engines, including rebuilding and overhauling such engines. Stepanek reviewed documents regarding the repairs made to the truck, viewed photographs, spoke with Genetti and his drivers about their experiences with the truck, and looked at photographs of the engine in the truck. On cross-examination, Stepanek conceded that he did not consider himself to be an expert in engine design or truck sales and admitted that he had not personally seen any of the damaged parts from the truck's engine.

Over objection, Stepanek testified that the repairs done to the truck were indicative of a complete engine failure each time. He stated that trucks can heat up when climbing a mountain or steep grade and that he did not think that such use would do damage to a truck if it was not run into the red zone on the temperature gauge. Stepanek testified that an engine failure could cause radiator fluid to come out of the tailpipe, but eliminated damage to the radiator as a possible cause of the fourth breakdown because no radiator leak was found. He believed the coolant leak indicated an engine failure possibly due to a cracked head, cracked head gasket, or some other failure that allowed an intrusion of coolant into the engine.

Stepanek stated that he did not see any evidence that the Genettis had abused the truck and opined that the first two repairs

had presented to Caterpillar and General Motors a reasonable opportunity to fix the problem and that the additional problems should never have occurred. Stepanek also testified that in his opinion, the use and fair market value of the truck had been substantially impaired. On cross-examination, Stepanek conceded that he could not identify a specific manufacturing defect or worker defect related to any one of the four breakdowns.

Testimony from employees of both Caterpillar and General Motors indicate that there was no evidence that the truck had been altered or modified in a way that would void the warranties. Generally, the employees were unable to state an opinion as to the cause of the first three breakdowns. In regard to the fourth breakdown, Douglas M. Chevalier, a mechanical engineer at Caterpillar who inspected parts from the truck, disagreed with Stepanek's testimony that the cause of the fourth breakdown could have been due to an engine failure evidenced by coolant running into the engine and/or coming out of the tailpipe. Chevalier provided testimony to refute Stepanek's theories and also provided testimony regarding "cavitation erosion," a condition Chevalier observed on the engine that is normally not seen until a vehicle has high mileage, hours, or load. Chevalier opined that the cause of the fourth breakdown was overheating and stated that he found no signs of defects in manufacturing or workmanship.

Chevalier testified that theoretically, he would not consider the actions taken by Seeley of stopping and adding coolant while keeping the temperature gauge out of the red zone to be improper maintenance. He stated that in practice, however, the truck arrived at Commerce City in an overheated condition.

Valbert, another Caterpillar expert, testified that based on the weight information and a calculation that indicates how hard the engine has to work to do its job, the truck fell into a range labeled "severe application." Valbert testified that it did not mean the use of the truck was prohibited, but that it meant the truck was placed in a severe environment. Valbert testified that in his opinion, the cause of the fourth breakdown was overheating.

### 7. POSTTRIAL MOTIONS

At the conclusion of the Genettis' evidence, General Motors and Caterpillar moved for a directed verdict, arguing that there

was an absence of proof of a defect in material or workmanship. The motions were overruled. At the instruction conference, General Motors objected to the verdict form pertaining to the U.C.C. claim, arguing that a parenthetical notation on the form was not a correct statement of the law. The form reads as follows:

If you find for the Plaintiffs:

1. Please write in the blank the Plaintiffs total damages:

_____

2. How much of these damages were proximately caused by Defendant Caterpillar's breach of warranty:

_____

3. How much of these damages were proximately caused by Defendant General Motor's [sic] breach of warranty: _____

(NOTE: The totals of lines numbered 2 and 3 must equal that of line number 1.)

The objection was overruled.

## 8. VERDICT

The jury returned a verdict in favor of the Genettis on the breach of warranty claim. The jury found the total damages to be $105,000 with $36,500 allocated to Caterpillar and $68,500 allocated to General Motors. The jury also found that General Motors was liable under the Warranty Act but did not assess damages. The Genettis then made motions to amend their petition for an award of prejudgment interest, costs, and attorney fees. The Genettis also made a motion to assess damages against General Motors under the Warranty Act. In that motion, the Genettis requested damages of at least $53,578.71 and argued that any damages under the Warranty Act were concurrent with damages assessed for breach of express warranty under the U.C.C. up to that amount. On May 3, 1999, Caterpillar made a motion to set aside the verdict and for a new trial and General Motors made a motion for a new trial.

On June 8, 1999, the district court issued an order concluding that breach of express warranty under the U.C.C. and a violation of the Warranty Act were separate statutory proceedings, each complete in themselves. The order also stated that a mistake had probably been made in submitting the theory of recovery under

the Warranty Act to the jury. The court then ordered the Genettis to file an election of remedies within 10 days.

On June 24, 1999, the district court issued a memorandum stating that it had taken under advisement a motion by the Genettis to withdraw or reconsider the order of June 8. In the memorandum, the district court concluded that an action under the Warranty Act was equitable in nature and that the Genettis had an adequate remedy at law under the U.C.C. As a result, the court stated that it intended to dismiss the claim under the Warranty Act and denied an award of attorney fees. In its final order, the district court awarded prejudgment interest and dismissed the Warranty Act claim, resulting in a judgment against Caterpillar of $39,600.47 and a judgment against General Motors of $74,319.88. Caterpillar appeals, and the Genettis and General Motors cross-appeal.

## II. ASSIGNMENTS OF ERROR

Caterpillar assigns that the district court erred in denying its motion for a (1) directed verdict and motion to set aside the verdict based on the finding that the Genettis did not have to prove an engine defect to recover for breach of warranty and (2) new trial based on the admission of Heiser's testimony in light of the fact that the court later dismissed the Warranty Act claim.

In its first brief filed on cross-appeal, General Motors joins Caterpillar in assigning that the district court erred in overruling the motions for a directed verdict and motions for a new trial and joins Caterpillar's arguments regarding proof of a defect. General Motors also assigns that the district court erred in admitting Heiser's testimony, but advances a somewhat different argument than Caterpillar on the issue. Finally, General Motors assigns that the district court erred in submitting a verdict form to the jury which required them to allocate damages between the defendants.

In its second brief filed on cross-appeal, General Motors assigns three additional, different assignments of error.

The Genettis assign on cross-appeal, rephrased, that the district court erred in requiring them to make an election of remedies between the Warranty Act and the U.C.C.; dismissing their Warranty Act claim; and because the Warranty Act claim was

dismissed, failing to award attorney fees and costs under the Warranty Act.

## III. STANDARD OF REVIEW

■ A directed verdict is proper at the close of all the evidence only where reasonable minds cannot differ and can draw but one conclusion from the evidence, that is to say, where an issue should be decided as a matter of law. *Cole v. Loock*, 259 Neb. 292, 609 N.W.2d 354 (2000); *Lackman v. Rousselle*, 257 Neb. 87, 596 N.W.2d 15 (1999).

■ The party against whom a verdict is directed is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every inference which can reasonably be drawn from the evidence. If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law. *Smith v. Paoli Popcorn Co.*, 260 Neb. 460, 618 N.W.2d 452 (2000); *McLain v. Ortmeier*, 259 Neb. 750, 612 N.W.2d 217 (2000).

■ A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *O'Connor v. Kaufman*, 260 Neb. 219, 616 N.W.2d 301 (2000); *Sharkey v. Board of Regents*, 260 Neb. 166, 615 N.W.2d 889 (2000).

■ A motion for new trial is to be granted only when error prejudicial to the rights of the unsuccessful party has occurred. *McLain v. Ortmeier, supra*; *Hausman v. Cowen*, 257 Neb. 852, 601 N.W.2d 547 (1999).

## IV. ANALYSIS

### 1. GENERAL MOTORS' SECOND CROSS-APPEAL

Before addressing the merits of this appeal, we first address which assignments of error are properly before us. Caterpillar filed an appeal of the district court's order, and the Genettis and General Motors filed cross-appeals. On January 25, 2000, General Motors filed a brief of the appellee and brief on cross-appeal containing five assignments of error. On April 21, General Motors filed an answer brief on Genettis' cross-appeal and a brief on cross-appeal containing three new assignments of error. The Genettis filed an answer brief contending in part that

the second brief on cross-appeal filed by General Motors was out of time and that Neb. Ct. R. of Prac. 9 (rev. 2000) does not authorize the filing of two cross-appeals in the same proceeding. We agree.

We have said that the purpose of an appellant's reply brief is to respond to the arguments the appellee has advanced against the errors assigned in the appellant's initial brief. *Keithley v. Black*, 239 Neb. 685, 477 N.W.2d 806 (1991). Thus, errors not assigned in an appellant's initial brief are waived and may not be asserted for the first time in a reply brief. *Id.*

The rules regarding the manner of presenting a cross-appeal are the same as the rules applicable to an appellant's brief. *Knaub v. Knaub*, 245 Neb. 172, 512 N.W.2d 124 (1994). Thus, we conclude that errors not assigned in the initial brief on cross-appeal are waived and may not be asserted for the first time in an answer brief. Accordingly, we will not address the assignments of error raised in General Motors' second brief on cross-appeal.

## 2. PROOF OF DEFECT

Caterpillar and General Motors argue that the district court should have directed a verdict in their favor because the Genettis failed to present expert testimony to prove that the fourth breakdown was caused by a defect in material and workmanship. In particular, it is argued that Stepanek failed to provide an opinion with any reasonable degree of certainty regarding what caused the breakdowns and could not point to a specific defect in material or workmanship. The Genettis contend that they need not prove the specific defect that caused the breakdowns in order to prove that the engine was defective.

The Warranty Act provides:

> If the manufacturer, its agents, or authorized dealers are unable to conform the motor vehicle to any applicable express warranty by repairing or correcting any defect or condition which substantially impairs the use and market value of the motor vehicle to the consumer after a reasonable number of attempts, the manufacturer shall replace the motor vehicle with a comparable motor vehicle or accept return of the vehicle from the consumer and refund

to the consumer the full purchase price including all sales taxes, license fees, and registration fees and any similar governmental charges, less a reasonable allowance for the consumer's use of the vehicle. . . . It shall be an affirmative defense to any claim under sections 60-2701 to 60-2709 (1) that an alleged nonconformity does not substantially impair such use and market value or (2) that a nonconformity is the result of abuse, neglect, or unauthorized modifications or alterations of a motor vehicle by a consumer.

§ 60-2703.

Concerning breach of express warranty, we have said that in order for a plaintiff to recover, he or she must show, among other things, that " 'the goods did not comply with the warranty, that is, that they were defective.' " *Delgado v. Inryco, Inc.*, 230 Neb. 662, 666-67, 433 N.W.2d 179, 183 (1988). Thus, where no evidence is provided to show that a defect in a product caused the plaintiff's damages, he or she cannot recover for breach of warranty. *Id.* We have further said:

"The reliance on eyewitnesses alone is not fatal when a defect is obvious to a layman, but when standards of performance of the product are not generally known, other evidence, usually expert testimony, is necessary to prove proper or acceptable standards of performance. That evidence may be by evidence as to usages in the trade, the characteristics exhibited by similar goods manufactured by other sellers, or by government standards and regulations in the area."

*Id.* at 667, 433 N.W.2d at 183, quoting *Durrett v. Baxter Chrysler-Plymouth, Inc.*, 198 Neb. 392, 253 N.W.2d 37 (1977). We have not decided, however, whether a precise or specific defect must be proved in order to find that a product is defective under either the U.C.C. or the Warranty Act.

Of the few jurisdictions that have directly addressed the issue, the majority do not require proof of a specific defect under either the U.C.C. or a statutory scheme similar to the Warranty Act. See, e.g., *Universal Motors, Inc. v. Waldock*, 719 P.2d 254 (Alaska 1986) (applying federal Magnuson-Moss Warranty Act and stating that same principle applies under U.C.C.); *Mason v. Porsche Cars of North America*, 688 So. 2d 361 (Fla.

App. 1997) (applying Magnuson-Moss Warranty Act and state's warranty act); *Osburn v. Bendix Home Systems, Inc.*, 613 P.2d 445 (Okla. 1980) (applying U.C.C.); *Vernon v. Lake Motors*, 26 Utah 2d 269, 488 P.2d 302 (1971) (applying rule in breach of warranty action without stating if it was under U.C.C.). Rather, it is generally held that a plaintiff is not required to prove the specific product defect and that the proof may be circumstantial in nature or inferred from the evidence. See, *Mason, supra*; *Osburn, supra*; *Redman Homes, Inc. v. Ivy*, 920 S.W.2d 664 (Tex. 1996) (applying U.C.C.); *Vernon, supra*; *Colorado Serum Company v. Arp*, 504 P.2d 801 (Wyo. 1972) (applying U.C.C.). See, generally, *Ventura v. Ford Motor Corp.*, 180 N.J. Super. 45, 433 A.2d 801 (1981).

As one court explained, "Problems arise when a consumer is required to prove that there are defects in specific materials or particular workmanship." *Universal Motors, Inc.*, 719 P.2d at 259. Under the Warranty Act, the consumer must present credible evidence that the defect is caused by materials or workmanship, but the burden to show consumer abuse is on the warrantor. This burden of proof requirement is basically ignored if the consumer is charged with proving not only that a defect existed, but the specific or precise cause of the defect. See *id.* (discussing this consideration under Magnuson-Moss Warranty Act). Further, under many warranties, including the warranties at issue in this case, a consumer requiring warranty service on a vehicle may take the damaged vehicle only to a service department at an authorized dealer. Thus, in a case involving an automobile, the Alaska Supreme Court stated:

> Placing the burden on the consumer to prove a precise defect is unfair and unconscionable since the dealer and manufacturer could tamper (whether intentionally or inadvertently) with the evidence. For example, [the consumer] claims that [the manufacturer's] work on the engine destroyed evidence of timing problems because the cylinder head was removed.
>
> . . . To impose an unreasonably heavy burden on consumers is to deny them a meaningful remedy.

*Universal Motors, Inc.*, 719 P.2d at 259. This principle applies to a claim under either the Warranty Act or the U.C.C. Likewise,

the Florida Court of Appeals has stated that "[i]n light of the technological complexity of most automobiles currently on the market, forcing consumers to identify the cause, rather than the effect, of a defect would be unrealistically burdensome to the very persons the Warranty Act was meant to aid." *Mason*, 688 So. 2d at 367. See, also, *Vernon*, 26 Utah 2d at 275, 488 P.2d at 306 ("warranty should be given effect, not in any unduly precise or technical interpretation, but in accordance with what the ordinary purchaser would understand from its language").

We find these cases persuasive and hold that a precise or specific defect does not need to be proved in order to find a product defective under either the U.C.C. or the Warranty Act. Although expert testimony pointing to a specific defect would be the best means of proving the existence of a defect in some cases, proof that the warranted product is defective may be circumstantial in nature and may be inferred from the evidence. We now turn to the question of whether the Genettis presented sufficient evidence of a defect in order to overcome Caterpillar's and General Motors' motions for a directed verdict.

Although Stepanek could not specifically state what caused the fourth breakdown to occur, he did advance several reasons supported by the testimony and repair records. Stepanek testified that he did not believe the breakdown was due to overheating, but was instead due to an engine failure, such as a cracked head gasket or cracked block that caused coolant to run into the engine. It was not required that Stepanek testify regarding a specific design defect. Further, the Genettis presented evidence that the actions of their employees during the fourth breakdown were proper, including an admission from Chevalier that, theoretically, Seeley's actions were not improper. Thus, the Genettis presented evidence eliminating abuse or misuse as the alternate cause of the breakdown. At that point, it was reasonable for a jury to conclude that if the breakdown was not due to improper use of the truck, then it was due to a defect such as one of those suggested by Stepanek. See, generally, *Colorado Serum Company v. Arp*, 504 P.2d 801 (Wyo. 1972) (plaintiffs adduced proof eliminating alternate causes of their damages, leaving inference of defect). Looking at the evidence, a jury using common sense and experience could reasonably arrive at the con-

clusion that the fourth breakdown was caused by a defect in the engine and should have been covered by the warranty. See *Vernon v. Lake Motors*, 26 Utah 2d 269, 488 P.2d 302 (1971). Accordingly, we conclude that the district court did not err when it refused to direct a verdict.

### 3. Heiser's Testimony

Caterpillar and General Motors argue that Heiser's testimony was not relevant and should not have been admitted. Both argue that because Heiser did not testify to a specific defect in the engine, the jury could conclude through improper inference that the problems Heiser had with the truck were related to the problems the Genettis had. Caterpillar additionally argues that because Heiser's testimony was admitted against General Motors only on the Warranty Act claim and that that claim was later dismissed, the district court erred in overruling their motions for a new trial.

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *Nickell v. Russell*, 260 Neb. 1, 614 N.W.2d 349 (2000); *Snyder v. EMCASCO Ins.* Co., 259 Neb. 621, 611 N.W.2d 409 (2000). Because the exercise of judicial discretion is implicit in determinations of relevancy and admissibility under Neb. Rev. Stat. § 27-401 (Reissue 1995), the trial court's decision will not be reversed absent an abuse of discretion. See, *Snyder, supra*; *Holden v. Wal-Mart Stores*, 259 Neb. 78, 608 N.W.2d 187 (2000). An abuse of discretion occurs when the trial judge's reasons or rulings are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Holden, supra.* We have said that an issue as to the existence or occurrence of a particular fact, condition, or event may be proved by evidence as to the existence or occurrence of similar facts, conditions, or events under the same or substantially similar circumstances. *Id.*

In this case, the Genettis offered Heiser's testimony to show that the engine in the truck broke down a fifth time in a manner that was the same or substantially similar to the previous break-

downs. Heiser testified that after he purchased the truck, he encountered problems where the truck lost power and smoked excessively. Later, the engine locked up and water came out of the exhaust pipe, and it was determined that the engine block on the truck was cracked between the cylinders. As a result, General Motors and/or Caterpillar replaced the engine under the truck's warranty. Thus, Heiser testified that the truck broke down in a same or substantially similar manner as it did during the first four breakdowns.

Heiser's testimony was relevant to show that even after repairs were done to the truck in Colorado following the fourth breakdown, the truck still had an unrepaired defect. The testimony was also relevant to disprove allegations that the cause of the fourth breakdown was an overheating of the truck. By presenting evidence that the engine continued to fail in the same manner as it had before, a jury could infer that a defect that went undetected and unrepaired caused not only the fourth breakdown, but the breakdown Heiser encountered as well. As we have previously discussed, we do not require testimony of a specific or precise defect. Evidence of whether a defect continued in the truck and whether the fourth breakdown was caused by a defect as opposed to abuse or misuse of the truck was relevant to the Genettis' theories of recovery under both the Warranty Act and the U.C.C. Thus, we conclude that the district court did not err in admitting Heiser's testimony. Because we conclude that the testimony was relevant under both of the Genettis' theories of recovery, we further conclude that the district court did not err in overruling Caterpillar's motion for a new trial.

### 4. GENETTIS' CROSS-APPEAL

#### (1) Dismissal of Warranty Act Claim

The Genettis contend that the district court erred when it dismissed their Warranty Act claim, finding that the Warranty Act was in equity and that the Genettis had an adequate remedy at law under the U.C.C. We have not previously addressed whether the Warranty Act is an action at law or an action in equity.

We have, however, set out general principles for determining whether a cause of action is equitable or at law. The essential character of a cause of action and the remedy or relief

it seeks as shown by the allegation of the complaint determine whether a particular action is one at law or in equity. *Dillon Tire, Inc. v. Fifer*, 256 Neb. 147, 589 N.W.2d 137 (1999). The nature of an action, whether legal or equitable, is determinable from its main object, as disclosed by the averments of the pleadings and the relief sought. *Id.* This determination is unaffected by the conclusions of the pleader or what the pleader calls it. *Id.* Where a statute provides an adequate remedy at law, equity will not entertain jurisdiction, and the statutory remedy must be exhausted before equity may be resorted to. *Southwest Trinity Constr. v. St. Paul Fire & Marine*, 243 Neb. 55, 497 N.W.2d 366 (1993).

In determining that an action under the Warranty Act is in equity, the district court relied on *Motor Vehicle Mfrs. v. State*, 75 N.Y.2d 175, 550 N.E.2d 919 (1990). In that case, the New York Court of Appeals addressed the constitutionality of a mandatory arbitration clause under the state's warranty act based on the argument that an action under the act was at law, thus affording the right to a jury trial. The court further concluded that an action under the act was in equity. In reaching this conclusion, the court reasoned that the replacement remedy provided for under New York's warranty act was akin to specific performance, an equitable remedy. The court determined that the refund remedy was like the remedy of rescission, also an equitable remedy. The court distinguished the state's warranty act remedies from a similar remedy under the U.C.C. for remedy of revocation of acceptance on the basis that under the state's warranty act, cancellation of the contract does not occur before litigation. See, also, *Motor Vehicle Manufacturers Assn. of the United States v. O'Neill*, 212 Conn. 83, 561 A.2d 917 (1989) (no right to jury trial under state warranty act because it was essentially equitable claim for specific performance or rescission; superseded by statute on other grounds as stated in *General Motors Corp. v. Dohmann*, 247 Conn. 274, 722 A.2d 1205 (1998)).

We are not persuaded by the reasoning of these cases. The New York Court of Appeals considered the state's warranty act before it as providing for a cancellation of the contract after litigation. We do not interpret Nebraska's Warranty Act in this manner. Although the remedy afforded by the Warranty Act is similar to the remedy of rescission, not all forms of rescission

are in equity. In particular, the remedy of revocation of acceptance under the U.C.C., a remedy similar to the remedy afforded under the Warranty Act, yet also much like an action based on rescission, is an action at law and not in equity. *Koperski v. Husker Dodge, Inc.*, 208 Neb. 29, 302 N.W.2d 655 (1981). See Neb. U.C.C. § 2-608 (Reissue 1992).

In *Koperski*, we stated:

> Although rescission was originally an equitable remedy, it is now clear that there are two types of rescission, one being applied to a law action and the other designated as equitable rescission. . . . The Uniform Commercial Code, however, does not use the term "rescission" with reference to Neb. U.C.C. § 2-608 (Reissue 1971), but refers to that remedy under its statutory provisions as "revocation of acceptance." In White & Summers, Uniform Commercial Code (2d ed. 1980), these authorities discuss the relationship between "rescission" and "revocation of acceptance" in § 8-1 at 295 as follows: "A word should be devoted to the ambiguous action called 'rescission.' Some use the word rescission to encompass what the Code defines as a rejection or revocation of acceptance; others use it to mean simply the buyer's act in returning the goods; still others use it to cover the buyer's cancellation of the executory terms of the contract; and finally some might call it the buyer's cause of action for fraud, (including presumably the return of the goods, cancellation of the executory portion of the contract and the return of money paid). It is the apparent intention of the drafters to restrict the word rescission to a rather limited number of cases, those involving a mistake or in which the seller has committed fraud, duress, or the like."

208 Neb. at 37-38, 302 N.W.2d at 660, citing § 2-608, comment 1. We then held that since the plaintiff's action was based on the U.C.C., the action was at law. *Koperski, supra*. See, also, *G.M.A.C. v. Jankowitz*, 216 N.J. Super. 313, 523 A.2d 695 (1987) (since revocation of acceptance is statutory remedy and not equitable action for rescission, it is action at law).

We are persuaded that the remedy under the Warranty Act is essentially the same in character as the U.C.C. remedy of

revocation of acceptance. Unlike a true equitable rescission, the Warranty Act does not base its provision of a remedy on fraud or mistake. Compare *State ex rel. Douglas v. Schroeder*, 222 Neb. 473, 384 N.W.2d 626 (1986) (principal thrust of Nebraska Consumer Protection Act is to prevent unfair or deceptive practices, thus act is in equity). Rather, the Warranty Act provides a remedy essentially the same as revocation of acceptance, but removes what were viewed as some roadblocks to recovery under the U.C.C. Therefore, we determine that the appropriate analogy is to revocation of acceptance rather than to equitable rescission. As we explained in *Koperski*, such a remedy is obtained through an action at law. Accordingly, we hold that an action under the Warranty Act is an action at law and that the district court erred when it dismissed the Genettis' claim under the Warranty Act.

## (2) Election of Remedies

The Genettis next contend that if the Warranty Act is an action at law, the district court erred when it originally ordered them to make an election of remedies. The Genettis contend that their action under the U.C.C. for breach of warranty and the action under the Warranty Act are theories of recovery under which they can recover different damages without concerns of obtaining a double recovery because the U.C.C., unlike the Warranty Act, allows recovery of incidental and consequential damages, while the Warranty Act allows recovery of attorney fees. Thus, the Genettis argue that they should recover under the Warranty Act against General Motors up to the amount awarded under the Warranty Act and then recover the remainder of the jury verdict against both Caterpillar and General Motors under the U.C.C.

Where a party pleads alternative theories of recovery which are inconsistent in the sense that he or she cannot logically choose one without renouncing the other, he or she must elect between them. *Tobin v. Flynn & Larsen Implement Co.*, 220 Neb. 259, 369 N.W.2d 96 (1985). See *Cao v. Nguyen*, 258 Neb. 1027, 607 N.W.2d 528 (2000). But when alternative theories are consistent, a party must proceed on the alternative theories or forever forgo one theory over the other. *Life Investors Ins.*

*Co. v. Citizens Nat. Bank,* 223 Neb. 663, 392 N.W.2d 771 (1986). For example, a party cannot proceed on a theory of recovery which is premised on the existence of a contract and at the same time proceed alternatively on a theory that is premised on the lack of a contract. *Vowers and Sons, Inc. v. Strasheim,* 254 Neb. 506, 576 N.W.2d 817 (1998); *Tobin, supra.* Consequently, one who has been induced to enter into an agreement by virtue of a material misrepresentation, that is to say, by virtue of fraud, may either affirm the agreement and sue for damages or disaffirm the agreement and sue to be reinstated to his or her position as it existed before entry into the contract. *Vowers and Sons, Inc., supra.* This is so because one remedy, damages, depends upon the existence of a contract, and the other, rescission, depends upon the concept that because of the fraud, no contract came into existence. *Id.* Likewise, we have held that the remedies of rescission and damages are inconsistent; the former proceeding upon disaffirmance, and the latter on affirmance of the contract. *Russo v. Williams,* 160 Neb. 564, 71 N.W.2d 131 (1955).

The doctrine of election of remedies is applicable only where inconsistent remedies are asserted against the same party or persons in privity with such a party. *Vowers and Sons, Inc., supra.* However, a party may not have double recovery for a single injury or be made " 'more than whole' " by compensation which exceeds the actual damages sustained. 254 Neb. at 516, 576 N.W.2d at 825. Where several claims are asserted against several parties for redress of the same injury, only one satisfaction can be had. *Id.*

We have never addressed whether damages can be recovered under both the Warranty Act and the U.C.C. for breach of warranty. As previously stated, the remedy under the Warranty Act is essentially the same as the U.C.C. remedy of revocation of acceptance. Thus, in the absence of cases involving an election of remedies between the U.C.C. and a state's warranty act, we find guidance from cases analyzing the remedy of revocation of acceptance.

Other jurisdictions have held that when recovery is sought under the U.C.C. for both breach of warranty and revocation of acceptance, the plaintiff cannot recover under both theories.

*General Motors Acceptance Corp. v. Anaya*, 103 N.M. 72, 703 P.2d 169 (1985); *Adams v. Grant*, 292 S.C. 581, 358 S.E.2d 142 (S.C. App. 1986). See, generally, *Griffith v. Latham Motors, Inc.*, 128 Idaho 356, 913 P.2d 572 (1996) (stating that revocation of acceptance and breach of warranty are two different claims; plaintiff was entitled to bring both, but plaintiff could have only one satisfaction); *Hardy v. Winnebago*, 120 Md. App. 261, 706 A.2d 1086 (1998) (implying in dicta that plaintiff may not recover under both state's warranty act and breach of warranty claims). But see, *Maserati Automobiles Inc. v. Caplan*, 522 So. 2d 993 (Fla. App. 1988), *disapproved on other grounds, Perez-Borroto v. Brea*, 544 So. 2d 1022 (Fla. 1989) (stating that election is not required between revocation of acceptance and breach of warranty and concluding that election was not required under state warranty act); *Garrett v. Mazda Motors of America*, 844 S.W.2d 178 (Tenn. App. 1992) (holding that election is not required between action for fraud or punitive damages and state's warranty act claim).

In *Anaya, supra*, the New Mexico Supreme Court held that once a jury found the plaintiffs had successfully proved all the elements essential to establish a rightful revocation of acceptance, a claim based on breach of warranty was extinguished. The court noted that although New Mexico's version of the U.C.C. § 2-608, comment 1, states that a buyer is not required to elect between revocation of acceptance and recovery of damages for breach, the nonalternative nature of the remedies does not entitle the buyer to a double recovery. Accordingly, the court stated that "although initially a buyer may present both theories and need not elect between them, the finding of either final acceptance or revocation of acceptance of nonconforming goods ultimately determines the available remedy." *Anaya*, 103 N.M. at 74, 703 P.2d at 171.

Likewise, in *Adams, supra*, the South Carolina Court of Appeals held that a trial court properly submitted a case to a jury on whether the plaintiff had properly revoked acceptance of a vehicle and breach of warranty, utilizing special verdict forms. The court noted that the basic purpose of an election of remedies is to avoid a double recovery. The court stated, "In many instances, this means the case can go to the jury on all causes of

action supported by the evidence at trial, with election required after verdict but before judgment is entered." *Adams*, 292 S.C. at 585, 358 S.E.2d at 144.

Concerning revocation of acceptance, we have stated that once goods are accepted, the buyer is entitled to cancel the contract and recover so much as has been paid upon establishing that he or she has justifiably revoked his or her acceptance. See, *Warner v. Regan Buick*, 240 Neb. 668, 483 N.W.2d 764 (1992); *Wendt v. Beardmore Suburban Chevrolet*, 219 Neb. 775, 366 N.W.2d 424 (1985). The U.C.C. also provides that the buyer may recover damages in a suit for breach of warranty in regard to accepted goods. *Id.* We have said that the two options are non-alternative in character and that the buyer may pursue either remedy or both, but the remedies are treated in entirely different sections of the U.C.C. and offer separate forms of relief. *Id.*

Although we have not specifically discussed when, or if, an election must be made between remedies for breach of warranty and revocation of acceptance, in *Warner, supra*, and *Wendt, supra*, we cited to *Ford Motor Credit Co. v. Harper*, 671 F.2d 1117 (8th Cir. 1982), a case which indicates but does not clearly hold that an election is required. Further, when holding that a remedy for revocation of acceptance extinguishes recovery for breach of warranty, the court in *General Motors Acceptance Corp. v. Anaya*, 103 N.M. 72, 703 P.2d 169 (1985), also cited to *Harper* for this proposition.

We are persuaded by those cases which hold that an election must be made between remedies for breach of warranty and the remedy of revocation of acceptance but that both theories may be presented to the jury. Although the remedy under the Warranty Act is not the remedy of equitable rescission, it is based on a disaffirmance of the contract, while the U.C.C. remedy for breach of warranty is based on affirmance of the contract. Section 60-2708 provides that nothing in the Warranty Act "shall in any way limit the rights or remedies which are otherwise available to a consumer under any other law." We read this section to mean that a theory of recovery under the Warranty Act may be brought together with other theories of recovery. Because actions for relief under the Warranty Act and the U.C.C. have different elements of proof, a plaintiff could prove

one theory but not the other. Thus, both theories may be submitted to the jury. Recovery under both, however, is inconsistent. Once a plaintiff receives verdicts under both theories of recovery, he or she must elect between them. In this case, the Genettis could elect to recover damages and attorney fees under the Warranty Act or elect to recover damages, including incidental and consequential damages, under the U.C.C. They cannot, however, recover from both.

### 5. ALLOCATION OF DAMAGES

General Motors contends that the district court erred in utilizing a verdict form which required the jury to allocate damages between General Motors and Caterpillar on the breach of warranty claim. General Motors contends that the district court should have entered a single judgment against both Caterpillar and General Motors jointly and severally. The Genettis do not object to such a judgment as long their assignments of error are preserved and prejudgment interest is recalculated.

Under Nebraska common law, an act wrongfully done by the joint agency or cooperation of several persons, or done contemporaneously by them without concert, renders them liable jointly and severally. *Lackman v. Rouselle*, 257 Neb. 87, 596 N.W.2d 15 (1999), citing *Gergen v. The Western Union Life Ins. Co.*, 149 Neb. 203, 30 N.W.2d 558 (1948); *Kudlacek v. Fiat S.p.A.*, 244 Neb. 822, 509 N.W.2d 603 (1994) (where two causes produce single indivisible injury, joint and several liability attaches). Under tort law, where joint tort-feasors do not act as part of a common enterprise or plan, Neb. Rev. Stat. § 25-21,185.10 (Reissue 1995) alters the common law by limiting a plaintiff's recovery of noneconomic damages from any one tort-feasor to that tort-feasor's proportionate liability in an action involving more than one defendant. *Lackman, supra.*

This case does not involve a tort claim under which an allocation of damages between the parties might be necessary. Rather, this case involves a single injury caused by either defendant's breach of warranty. Thus, the Genettis could recover their damages from either defendant who could then seek indemnity or contribution from the other defendant. At oral argument, counsel for General Motors stated that an agreement

for indemnity or contribution did indeed exist between itself and Caterpillar, but such an agreement is not in the record. We further note that the Genettis' petition prayed for joint and several liability. We conclude that the district court erred in entering separate judgments against General Motors and Caterpillar on the U.C.C. claim.

## V. CONCLUSION

We conclude that the district court properly overruled General Motors' and Caterpillar's motions for a directed verdict. We also hold that the district court did not err in allowing Heiser's testimony into evidence and in overruling Caterpillar's motion for a new trial. The district court erred, however, in dismissing the Genettis' claim under the Warranty Act. We hold that although a claim under the Warranty Act is not an action in equity, an election of remedies must be made between recovery under the Warranty Act and under the U.C.C. for breach of warranty before a judgment is entered. We also hold that the court erred in entering separate judgments against Caterpillar and General Motors on the U.C.C. claim.

The record in this case reflects that the issue of damages under the Warranty Act was not submitted to the jury. Further, although the Genettis stated at oral argument that the district court initially made a determination of damages under the Warranty Act, we do not find any determination of damages in the record. Accordingly, we reverse, and remand for a new trial on the issue of damages under the Warranty Act and for an election of remedies if needed.

AFFIRMED IN PART, AND IN PART
REVERSED AND REMANDED.

WRIGHT and STEPHAN, JJ., not participating.