# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-4180

_____

Bradley Shuck; Gregory Shuck,                     *
                                                  *
            Plaintiffs,                            *
                                                  *
C-Line Farms, Inc.; Nucklay Farms,                *
Inc.,                                             *
                                                  *
            Plaintiffs-Appellees,                 *
                                                  *   Appeal from the United States
      v.                                          *   District Court for the District
                                                  *   of Nebraska.
CNH America, LLC, A Delaware                       *
Corporation,                                      *
                                                  *
            Defendant-Appellant.                  *

_____

Submitted: June 13, 2007
Filed: August 21, 2007

_____

Before MELLOY, SMITH, and GRUENDER, Circuit Judges.

_____

MELLOY, Circuit Judge.

A jury found combine manufacturer CNH America, LLC ("CNH"), liable under theories of breach of express warranty and strict liability after a fire in a combine's engine compartment caused extensive damage to the combine and to corn that was onboard the combine. CNH moved before trial to exclude the plaintiffs' fire causation expert and mechanical expert. CNH also moved before trial for summary judgment

and after trial for judgment notwithstanding the verdict. The district court[1] denied summary judgment and admitted the plaintiffs' experts but later agreed with the defendant that one of the plaintiffs' experts testified as to matters that exceeded the scope of his pre-trial report. The district court did not strike the challenged testimony but advised the jury that the expert testified to matters that exceeded the scope of his written opinion. Finally, the district court granted judgment as a matter of law as to claims for negligence and breach of implied warranty, but submitted to the jury claims of breach of warranty and strict liability. CNH now appeals, and we affirm.

I. Background

   A. The Combine and the Fire

   The combine at issue in this case is a 2003 Case International Harvester model 2388 Axial-Flow Combine manufactured by CNH ("the Combine"). Material to the present discussion, the Combine has a six-cylinder diesel engine and holds twenty quarts of oil. In each cylinder, a piston connected to a rod travels up and down throughout the sequential stages of a combustion cycle. Through each piston, combustion generates working motion that is transferred through a rod and wrist pin to a crankshaft that, ultimately, provides power for the Combine's various moving parts. We will refer to the area between each piston and the walls of its accompanying cylinder as the bore clearance. This area requires lubrication to minimize friction and heat that may cause damage to the piston and cylinder and that may cause the piston to seize within the cylinder.

   In September 2004, the plaintiffs purchased the used Combine from Fairbanks International, a farm equipment dealer in Hastings, Nebraska. Fairbanks International

---

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

had sold the Combine new to David Burr in 2003. The Combine was covered by a two-year/2000 hour written warranty that expired on September 14, 2005 ("the Warranty") and transferred to the plaintiffs with the Combine. The Warranty covered parts and labor for defects caused by material or workmanship if discovered and reported during the term of the Warranty and if the repair was performed at an authorized CNH location.

When the plaintiffs purchased the Combine it had been used for approximately 355 hours. Plaintiff Greg Shuck ("Greg") changed the oil at that time. He changed the oil a second time, on October 9, 2004, when the Combine had about 480 hours of use. The recommended period of time between oil changes on the Combine is 125-200 hours of use, depending on the oil, so this oil change was timely.

On October 10, after harvesting corn with the Combine for approximately two hours, Greg measured the oil using the dipstick, observed that it was "a slight amount . . . underneath full," and added a quart of oil. Greg also greased various points on the Combine, and in the process, he accessed the engine compartment and observed no indication of an oil leak. Greg continued to harvest with the Combine throughout October 10.

On the morning of October 11, Greg again checked the oil, observed that the oil "was up to the mark," and resumed harvesting. By mid-day on October 11, Greg had been harvesting with the Combine for approximately thirteen to fifteen hours since the October 9 oil change. At that time, Greg turned off the Combine for about thirty to forty-five minutes to tend to other matters. He then restarted the Combine, let it warm up for a couple of minutes, and resumed harvesting. Before he had traveled a quarter of a mile, he heard a loud squealing noise. He checked the monitors and saw no warning or indicator lights or buzzers suggesting that anything was wrong. He then looked in his mirror and saw flames. Greg was able to raise the grain head, and he attempted to back the Combine out of the field to avoid burning the standing

corn. The engine quickly lost power, however, and he was only able to back out about fifteen feet. He used an onboard fire extinguisher to put out flames on standing corn near the Combine. The fire department eventually arrived and extinguished the onboard fire, which had damaged the Combine and burned approximately 100 bushels of corn held within the Combine.

### B. The Experts and the Trial

Prior to trial, the plaintiffs identified Ken Ward as a fire causation expert and Steven Mikesell as a mechanical expert. CNH identified John Mertens as a fire causation and origin expert. Ward inspected the Combine in the week following the fire, examined the location in the field where the fire had occurred, and later attended a dismantling of the engine, where he was again able to inspect the Combine. Mikesell inspected the combine and engine when the engine was dismantled. Mertens inspected the Combine near the time of the fire and again at the time the engine was dismantled.

Ward concluded that the fire started in the engine compartment and was caused when the number six piston disengaged from the main crankshaft causing a connecting rod to flail about and punch holes through the forward and rearward sides of the engine block and through the oil pan. Ward concluded that these holes permitted the uncontrolled blending of oxygen and combustibles in the presence of multiple ignition sources, thus causing the fire. Ward did not offer an opinion as to the cause of the piston failure, but he ruled out the possibility that the fire was caused by oil starvation. Ward observed that only the piston and cylinder in the number six position displayed damage, whereas oil starvation would have caused friction, overheating, and damage in multiple cylinders. Ward observed that he saw no evidence of a massive oil leak, as one would expect if enough of the Combine's twenty quarts of oil had drained away to cause overheating related to general oil starvation. Greg Shuck's statements and his description of his actions and his

observation of the Combine around the time of the fire were consistent with Ward's opinion that the Combine had not suffered oil starvation. Greg operated the combine for thirteen to fifteen hours after he changed the oil and replaced the filter. He observed no oil spray or leak in the engine compartment on the two days following the oil change, and he observed no indication by way of warning lights, buzzers, or high-oil-pressure signals suggesting a problem while operating the Combine. Further, no witness claimed to observe a large quantity of oil on the ground.

Mikesell, like Ward, concluded that the engine did not display evidence of oil starvation. Mikesell stated that piston failure led to the fire, and he offered three explanations of how the piston may have failed. First, he suggested that the bore clearance at the number six position may have been insufficient, leading to friction, overheating, and failure at only this position. Second, he suggested that a wrist pin connecting the number six piston to the crankshaft may have failed. Third, and in Mikesell's opinion, most likely, there may have been a defect in the fuel delivery system. Like Ward, Mikesell explained in detail his observations and his reasons for rejecting oil starvation as a cause of the fire.

Mertens concluded that Greg Shuck improperly installed the oil filter at the time of the October 9 oil change such that enough of the twenty quarts of oil leaked from the engine to cause the engine to run dry. As a result, friction caused overheating and user error could be deemed the cause of the fire. Mertens testified that he observed no indication that oil had sprayed from the holes that were punched in the engine block, as had been stated by the plaintiffs' experts. He also testified that the oil filter had burned and that the burn patterns, in his opinion, suggested that the fire was centered around the oil filter.

The experts' testimony was largely consistent with and commensurate in scope with their respective pre-trial written opinions. One exception was Mikesell, who testified as to the three suggest defects listed above (insufficient bore clearance, wrist

-pin clearance, or fuel delivery problems) but did not address these three possible defects in his pre-trial written report. Mikesell did address the issue of a fuel delivery system defect months prior to trial in a deposition. The district court advised the jurors of the discrepancy between Mikesell's pretrial opinions and his opinion at trial, but did not strike the additional opinion testimony.

The competing experts' opinions presented two contradictory and competing theories of how the number six piston failed and how the fire started. Under CNH's theory, user error in the installation of an oil filter caused the number six piston to run dry, overheat, and seize, leading to engine failure and the ignition of leaked oil. The plaintiffs, on the other hand, presented testimony from Greg Shuck, who explained in detail his use and maintenance of the Combine and his observations of the engine compartment and warning indicators, none of which suggested an oil leak. Also, plaintiffs' experts Ward and Mikesell explained how the physical evidence disproved CNH's oil-leak theory, thus eliminating user error or misuse as a possible cause of the fire. The district court submitted the case to the jury based on these competing theories and the jury found for the plaintiffs. The parties had stipulated for the jury that the plaintiffs' loss amount as to the breach of warranty claim was $138,000 and the loss amount as to the strict liability claim was $141,850.18.[2] The jury returned verdicts for the plaintiffs on both counts, and CNH appeals.

---

[2] The parties indicated that this difference was due to the fact that Nebraska law allowed greater recovery on strict liability claims than on warranty claims. The strict liability loss amount allows for recovery of the value of the onboard corn while the warranty loss excludes that portion of the claim.

II. Discussion

A.    The Admission of Experts

CNH argues that the district court should have excluded the testimony and opinions of Ward and Mikesell prior to trial or, alternatively, should have excluded their opinions after the fact based on testimony they presented at trial.  As to Mikesell, CNH further argues that his testimony exceeded the scope of his opinion as disclosed by the plaintiffs under Federal Rule of Civil Procedure 26(a)(2)(B) and that the district court should have instructed the jury not to consider certain aspects of his testimony. We review the admission of expert testimony and the denial of a motion in limine for abuse of discretion.  United States v. Triplett, 195 F.3d 990, 998 (8th Cir. 1999); United States v. Littrell, 439 F.3d 875, 884 (8th Cir. 2006).  Similarly, we review for abuse of discretion a district court's election regarding how to treat evidence that was not disclosed in accordance with Rule 26(a)(2)(B).  Davis v. U.S. Bancorp, 383 F.3d 761, 765 (8th Cir. 2004) (applying an abuse of discretion standard to a district court's handling of a failure to disclose under Rule 26(a)(1)).  Finally, we note that, under Federal Rule of Civil Procedure 37(c)(1), evidence not disclosed under Rule 26(a) is admissible if harmless.

"'[Federal] Rule [of Evidence] 702 reflects an attempt to liberalize the rules governing the admission of expert testimony.'"  Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001) (quoting Weisgram v. Marley Co., 169 F.3d 514, 523 (8th Cir. 1999), aff'd, 528 U.S. 440 (2000)).  "The rule clearly 'is one of admissibility rather than exclusion.'"  Id. (quoting Arcoren v. United States, 929 F.2d 1235, 1239 (8th Cir. 1991)). Under Rule 702 and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), the court serves as gatekeeper to ensure  that a witness is "qualified as an expert by knowledge, skill, experience, training, or education," that the testimony is "based upon sufficient facts or data, . . . [and] is the product of reliable principles and methods," and that "the witness [applies] the principles and methods reliably to the

facts of the case." Fed. R. Evid. 702. When evaluating the methodology that an expert witness applies, it may be important to consider "(1) whether the theory or technique 'can be (and has been) tested'; (2) 'whether the theory or technique has been subjected to peer review and publication'; (3) 'the known or potential rate of error'; and (4) whether the theory has been generally accepted." Peitzmeier v. Hennessy Indus., Inc., 97 F.3d 293, 297 (8th Cir. 1996) (quoting Daubert, 509 U.S. at 593, 594). These factors are not exclusive, however, and they need not be considered in every case because, "[o]f course, the Daubert reliability factors should only be relied upon to the extent that they are relevant and the district court must customize its inquiry to fit the facts of each particular case." Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1083 (8th Cir. 1999) (internal citations omitted); see Daubert, 509 U.S. at 594 ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one.").

CNH does not argue that Ward or Mikesell were unqualified due to a lack of education or experience; CNH argues only that these two experts failed to follow established, reliable methodology in formulating their opinions and failed to limit their opinions to matters that were disclosed prior to trial. The challenge to the experts' methodology seems particularly misplaced given that Mertens, CNH's own expert, based his opinion on observations rather than tests—just like Ward and Mikesell. All three experts studied the Combine, engine, statements by Greg Shuck, and product literature. None of the experts tested damaged and burned Combine parts, conducted destructive testing of exemplar combines, or tested oil or soil from the Combine or the field. When a litigant clearly believes a certain methodology is acceptable as shown by his or her own expert's reliance on that methodology, it is disingenuous to challenge an opponent's use of that methodology.

Further, we find no abuse of discretion in the district court's admission of the challenged testimony. The failure to test components that were damaged or destroyed by fire did not necessarily render the experts' methodology flawed nor opinions inadmissible. Here, Ward and Mikesell testified that certain components could not be

tested due to the destruction or alteration of the components in the fire or due to the arrangement of the components in the damaged engine. For example, Mikesell explained that the fuel injectors, the liner of the cylinder in the number six position, and the oil filter were damaged to the point where they either could not be extracted from the engine or they could not be tested in a manner that would yield meaningful results.

In such a situation, observations coupled with expertise generally may form the basis of an admissible expert opinion. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999) ("Engineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases. In other cases, the relevant reliability concerns may focus upon personal knowledge or experience.") (internal citations omitted); id. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); Hickerson v. Pride Mobility Prods. Corp., 470 F.3d 1252, 1257 (8th Cir. 2006) (holding that a fire causation expert's opinion was admissible where the methodology involved no testing but the application of specialized knowledge to observations of a fire scene). Like the expert in Hickerson, and like CNH's own expert in this case, Ward and Mikesell observed the relevant evidence, applied their specialized knowledge, and systematically included and excluded possible theories of causation. CNH's complaints about the plaintiffs' experts are more properly directed to the jury and to the weight to be accorded the experts' opinions rather than to the question of admissibility. The district court did not abuse its discretion in admitting the challenged testimony.[3]

---

[3]CNH relies heavily upon Fireman's Fund Ins. Co. v. Canon U.S.A., Inc., 394 F.3d 1054 (8th Cir. 2005), for the proposition that all expert testimony on fire causation must be supported by appropriate testing. We believe CNH misreads Fireman's Fund. In that case, experts for the plaintiffs purported to conduct tests in accordance with standards set forth by the National Fire Protection Association in its publication NFPA 921: Guide for Fire and Explosion Investigations (1998). Id. at

B.  Scope of Mikesell's Testimony

CNH argues that the district court erred by permitting Mikesell to testify as to matters not contained in his written report that the plaintiffs disclosed prior to trial. In the written report—dated March 2005 and disclosed pursuant to Rule 26(a)(2)(B)—Mikesell presented a brief summary of his observations and his opinion. It was his observation that conditions at the number six piston were different than at the other piston positions, suggesting that the fire was caused by something other than engine-wide oil starvation.  It was his opinion that the fire started when the number six connecting rod pushed through the engine wall and the oil pan allowing air and fuel to mix in the presence of multiple ignition sources. In a deposition dated May 18, 2006, Mikesell further elaborated on his opinion and explained that he believed a fuel mixture problem caused by a defect in the fuel delivery system could have caused the piston to begin to seize in the cylinder.  At trial, he repeated these opinions and also testified that, although he believed a fuel delivery defect was the most likely cause of the piston seizure, an improper bore clearance or improper wrist pin clearance could have caused the seizure as well.

Based on the written report and deposition testimony, we believe the only additional opinion Mikesell presented in his trial testimony was the suggestion of possible bore clearance or wrist pin clearance defects.  Mikesell did not, however, claim that he considered these possible defects to be the most likely cause of the piston seizure.  Further, as explained below, the critical aspect of Mikesell's testimony

---

1058.  The district court in Fireman's Fund held that the experts' testing methods did not meet the standards of NFPA 921, and we agreed.  Id.  We also explained how the experts' test results did not support their opinions and how the experts failed "to reconcile . . . empirical evidence with their theory."  Id. at 1058-59.  Fireman's Fund does not stand for a bright line rule that expert opinions in fire cases always must be supported by testing to be admissible.  Rather, Fireman's Fund stands for the more general propositions that testing, if performed, must be appropriate in the circumstances and must actually prove what the experts claim it proves.

was not his "lukewarm" endorsement of three specific theories of defect, but his thorough and convincing explanation of how the evidence failed to support a theory of oil starvation due to user abuse or misuse.

To the limited extent that Mikesell's trial testimony exceeded the scope of his opinions as disclosed prior to trial, we believe the district court adequately addressed the discrepancy by advising the jurors of the discrepancy and instructing them to take this discrepancy into consideration when weighing Mikesell's testimony and credibility. See Davis, 383 F.3d at 765 ("Rule 37 does not provide for mandatory sanctions . . . .).

C.      Breach of Warranty

Under Nebraska law, to recover for a breach of express warranty, a plaintiff need not specifically identify the product defect which caused an accident if the plaintiff presents evidence: (1) sufficient for the jury to find an absence of user misuse or abuse and (2) sufficient to prove that the accident was the type of event that would not occur in the absence of a product defect. Genetti v. Caterpillar, Inc., 621 N.W.2d 529, 541-43 (Neb. 2001). There was extensive testimony as to the use and maintenance of the Combine, the events surrounding the fire, and the condition of the engine and the Combine following the fire. This evidence, viewed in a light most favorable to the verdict, provides ample support for the jury's conclusion that the fire was not caused by user misuse or abuse. The only theory of causation presented to the jury that involved user misuse or abuse was CNH's theory that Greg failed to properly install the oil filter, causing gallons of oil to drain from the Combine and the engine to run dry and seize. There was no suggestion, much less evidence, of any other form of misuse or abuse. Further, this Combine was less than two years old at the time of the fire. C.f. Crawford v. Sears Roebuck & Co., 295 F.3d 884, 886 (8th Cir. 2002) (refusing to apply a *res ipsa* theory to prove a product defect claim against a retailer where the retailer "sold the relevant [product] to an unknown purchaser more

than twenty years (and perhaps as many as twenty-eight years) before [the plaintiff] sustained his injury, and the [product's] history after its sale is completely unknown").

We must assume the jury believed Greg's testimony as to his maintenance practices and observations surrounding the fire. We must also assume the jury believed Mikesell's testimony explaining in detail why the evidence failed to support a theory of general oil starvation. After the jury rejected user misuse as a cause, it was empowered by Genetti to infer from circumstantial evidence that a product defect must have caused the piston seizure and resultant fire. See Genetti, 621 N.W.2d at 542 ("Thus, the Genettis presented evidence eliminating abuse or misuse as the alternate cause of the breakdown. At that point it was reasonable for a jury to conclude that if the breakdown was not due to improper use . . . then it was due to a defect such as one of those suggested by [the plaintiffs' expert].").

CNH argues that the plaintiffs must prove as a matter of law that no user misuse or abuse occurred before they can rely on this theory of recovery. CNH argues, therefore, that the court must find an absence of user misuse or abuse before a jury may infer a defect by circumstantial evidence without identification of a specific defect. This argument is a misreading of Genetti and a usurpation of the normal roles of jurors and judges. As quoted immediately above, the court in Genetti upheld a jury verdict based on an inferred defect where the jury was charged with deciding whether there was user abuse or misuse. Id. CNH offers no support for its position that the jury is unqualified to weigh evidence of user abuse or misuse, and we have found none.

C.    Strict Liability[4]

To prevail on a theory of strict liability in tort in Nebraska, a plaintiff must prove, among other things, that the product was defective when it left the defendant's control.  Jay v. Moog Auto., Inc., 652 N.W.2d 872, 879 (Neb. 2002).  Although the plaintiffs argue on appeal that Mikesell's testimony demonstrated the existence of one or more specific product defects—namely, a fuel system defect or a defect regarding the bore clearance or the wrist pin clearance at the number six position—we are not convinced that Mikesell's testimony sufficed to prove these specific defects.  In contrast, Mikesell's testimony, when coupled with Greg's account of his use and maintenance of the Combine, clearly was sufficient to disprove CNH's oil starvation/user error theory.  Accordingly, we must address the applicability of the *res ipsa* type, implied defect theory of Genetti, a warranty case, to the present claim of strict liability.

CNH correctly notes that the Nebraska Supreme Court has not extended the "implied defect" theory of Genetti into the context of strict liability product defect claims.  Given this state of the law, we are charged with predicting how Nebraska's highest court would rule if faced with this question.  In re Derailment Cases, 416 F.3d 787, 796 (8th Cir. 2005) ("Accordingly, we must attempt to predict what the Supreme Court of Nebraska would decide if it were to address the issue in this case.").  We believe the Nebraska Supreme Court would apply the same rule if asked to do so in the context of a strict liability product defect claim.

Nebraska has already cited with approval a general approach set forth in the Restatement Third of Torts § 2(b) which identifies a product defect as the core similarity between strict liability and implied warranty claims and therefore merges

---

[4]Because the count for strict liability included an additional $3,850.18 for damages to the onboard corn, resolution of the breach of warranty claim does not resolve this case and it remains necessary to address the strict liability claim.

-13-

theories of recovery for implied warranty with theories of recovery based on allegations of design or manufacturing defects. See Freeman v. Hoffman-La Roche, Inc., 618 N.W.2d 827, 842-44 (Neb. 2000) ("Instead of focusing on doctrinal tort categories such as negligence or strict liability, the Third Restatement functionally defines each of the three basic types of product defect claims: design, manufacturing, and warning defect claims. The Third Restatement adopts the position that the definition of 'defect' is the important issue and should remain the same regardless of the doctrinal tort category under which it is brought."). This merger-of-claims approach strongly suggests that Nebraska would accept the same forms of proof for establishing strict liability and warranty claims.

The court in Freeman declined to extend this merger of claims in the setting of an *express* warranty claim. Id. at 844. Importantly, however, the reason for not extending the Third Restatement position of merging claims was the presence of an additional, separate element in express warranty claims, namely, the presence of an express promise or warranty. Id. The Nebraska Supreme Court's refusal to equate strict liability claims with express warranty claims was not, then, based on a theory that the common definition of a defect somehow changed in the context of express warranties. Id. ("Express warranty is grounded in terms of an express promise made as part of a pending purchase. Thus, unlike implied warranties, there is a clearer contractual difference between a theory of recovery based on express warranty and a tort theory of recovery based on a product defect."). In Freeman, the court specifically found there was no express warranty. Id. Here, it is undisputed that there was an express warranty. As such, we can find no meaningful distinction suggesting that the Nebraska Supreme Court would refuse to permit the plaintiffs to use the Genetti, implied-defect method of proof in the context of the present strict liability claim.

Finally, we note that in predicting that the Nebraska Supreme Court would apply Genetti in this setting, we are not predicting a position that places Nebraska out of step with its neighbors or in a unique position. See Hickerson, 470 F.3d at 1257

-14-

("It is well established under Missouri law that juries may infer causation and the existence of product defects based on circumstantial evidence under a *res ipsa*-type theory such that some product liability claims may be submitted to juries without expert testimony that identifies specific product defects."); see also Lindsay v. McDonnell Douglas Aircraft, Corp., 460 F.2d 631, 638 n.4 (8th Cir. 1972) (collecting cases in which courts "allowed the proof of both a defect and the existence of a defect at the time the product left the defendant's possession to be made by circumstantial evidence").

Accordingly, we hold that the district court properly submitted the strict liability claim to the jury, sufficient evidence supports the jury's verdict as to this claim, and the district court properly denied the defendant's motion for judgment as a matter of law.

III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

_____